## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## WALKER V. THE GATEWAY MILLING COMPANY.

### June 14, 1917.

#### Absent, Whittle, P. and Burks, J.*

1. SALES—*Rejection by Buyer—Evidence.*—Defendant purchased of plaintiff fifteen cars of a commodity designated in the written order therefor as "Winter Wheat Bran." Defendant refused to accept eight of the cars, contending that he was entitled to bran without screenings. It was conceded that the bran delivered by plaintiff contained a certain percentage of screenings, but plaintiff contended that, under the custom and usage of the business, the expression "Winter Wheat Bran," as understood by both parties to the contract, designated a commodity which carried such screenings as were contained in the bran shipped by it to defendant. It was held that the following considerations bearing upon the legal effect of defendant's belated refusal of a part of the bran, after using nearly half of it, were properly submitted to the jury, under correct instructions from the court, first, that in his telegram rejecting the bran, defendant did not mention screenings, and that the evidence as a whole failed to show that the presence of screenings was, in fact, the subject or cause of any fault found with the bran before it was rejected; and secondly, that there was evidence tending to show that defendant overstocked himself in anticipation of a large contract for feeding horses which he failed to get.

2. USAGES AND CUSTOMS—*Parol Evidence—Interpretation and Construction.*—The words of a contract are to be understood in their ordinary and proper sense unless by usage of trade or otherwise they have, in respect to the subject matter, acquired a peculiar meaning; and such meaning is not clearly inconsistent with the terms of the contract. And this admission of evidence as to usage is not inconsistent with the general rule that a written contract is not to be contradicted or varied by parol evidence.

*Case submitted before Judge Burks took his seat.

28

3. CONTRACTS—*Usages and Customs.*—A usage or custom of either a trade or a locality, which would otherwise form a part of a transaction will equally form a part when the transaction has been embodied in a writing unless the terms of the writing clearly exclude the usage or custom; and the application of the rule in a given instance depends entirely on the nature of the transaction and the terms of the particular document, and precedents are of little service.

4. SALES—*Usages and Customs—Federal Statutes Against Adulteration.*—Plaintiff sold defendant a commodity designated in the contract as "Winter Wheat Bran." In an action by plaintiff against defendant for failure to accept the bran, evidence that under the usage or custom of the trade "Winter Wheat Bran" contained a certain percentage of screenings, did not contravene the provisions of the State and Federal statutes against the adulteration and misbranding of commercial feeding stuffs, it not being claimed that the screenings in the bran constituted an unlawful adulteration, nor that the tags which were in fact placed on the sacks, indicating the presence of screenings, constituted a misbranding. There is nothing in the statutes, State or Federal, to in any way interfere with the rules of evidence in cases where parties have employed trade terms having a definite meaning, even though these statutes require that meaning to be fully defined in the stamps placed on the goods.

5. USAGES AND CUSTOMS—*Appeal and Error—Conclusiveness of Verdict.*—Defendant contended that he had no actual knowledge of the custom or usage of the trade in question, and that it was not sufficiently certain and notorious to give rise to a presumption of knowledge on his part. There was evidence tending to support the contrary view, and the verdict of the jury is conclusive upon appeal.

6. CONTRACTS—*Interpretation and Construction—Surrounding Circumstances.*—It is entirely proper to permit the jury to consider the situation of the parties and the circumstances leading up to the making of the contract for the purpose of determining whether a usage of trade operated upon the minds of the parties in using the language which was employed in the contract.

7. CONTRACTS—*Interpretation and Construction—Questions of Law and Fact.*—Where the true meaning of the terms of a contract depended upon controverted facts and conflicting evidence, the question was one for the jury, upon proper instructions, to determine.

8. SALES—*Resale—Notice of Time and Place to Buy.*—Where upon a breach of contract of sale by a purchaser, he was notified that the subject of the sale would be resold at his risk, there is no rule of law requiring that he should be given notice of the time and place of sale.

Error to a judgment of the Corporation Court of the city of Newport News, in a proceeding by motion for a judgment for money. Verdict for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*J. W. Read* and *Lett & Massie,* for the plaintiff in error.

*Nelms, Colonna & McMurran* and *A. D. Jones,* for the defendant in error.

KELLY, J., delivered the opinion of the court.

About the middle of January, 1915, H. B. Walker, of Newport News, purchased from The Gateway Milling Company, of Kansas City, through a Suffolk brokerage firm, fifteen cars of a commodity designated in the written order therefor as "Winter Wheat Bran." Rush shipments were requested by Walker, and the cars were all in Newport News by February 9, 1916. The bills of lading for these cars, with drafts attached, were forwarded to a Newport News bank. On March 2, 1916, after Walker had taken up the drafts and bills of lading for six of the cars and disposed of the same to a customer, he sent the following telegram to the Gateway Milling Company: "Unloaded six cars bran find other cars promiscuous shipments not uniform grade. Shipped by different mills not like sample several cars unable use, two cars transferred

in transit and bags torn up wire disposition of cars not according to sample and cars containing torn sacks."

Some days later, about March 12th, Walker took up one more draft and applied the car thus secured in completing a contract which he had previously made with the purchaser to whom he had sold the other cars; but with the exception of this car he stood upon his rejection of the remaining portion of the shipment.

Immediately upon receipt of the telegram above quoted, the Milling Company took up the matter of disposing of the rejected cars to the best advantage, apparently using every effort to this end, including an unsuccessful attempt to induce Walker to complete the contract, with the final result that a sale was made early in April to P. W. Hiden, the same party to whom Walker had sold the seven cars which he had accepted and paid for. This sale, however, was made at considerably less than the contract price.

Thereupon, this proceeding by motion was instituted to recover the loss thus sustained by the vendor, and there was a verdict and judgment against Walker which he brings here upon a writ of error.

The controversy hinges upon the proper interpretation to be given to the words "Winter Wheat Bran," as used in the contract between the parties. It is conceded that the bran contained a certain percentage of screenings. Walker's contention is that he was entitled to bran without screenings, and the Milling Company contends that, under the custom and usage of the business, the expression "Winter Wheat Bran," as understood by both parties to the contract, designated a commodity which carried such screenings as were contained in the bran shipped by it to Walker.

A circumstance which, perhaps, had considerable weight with the jury, and which was properly before them under correct instructions from the court, was that in his tele-

gram of March 2nd rejecting the bran, Walker did not mention screenings, and that the evidence as a whole fails to show that the presence of screenings was, in fact, the subject or cause of any fault found with the bran before it was rejected. There was evidence tending to show that Walker over-stocked himself in anticipation of a large contract for feeding horses which he failed to get. These and other considerations bearing upon the legal effect of Walker's belated refusal of a part of the bran, after using nearly half of it, were properly submitted to the jury. Their verdict for the plaintiff renders it unnecessary for us to determine whether, under the evidence, and, as claimed by plaintiff, these considerations were sufficient as a matter of law to cut off any defense.

The principal assignment of error, to quote from the petition, is "that the court erred in admitting evidence of custom to contradict, vary and add to the written agreement between the parties."

This assignment proceeds upon a misconception of the rule against the use of parol evidence to contradict or vary the terms of a written contract. The evidence which the court permitted to go to the jury with reference to the usage and custom of the trade was not designed to vary or contradict the contract, but to interpret certain terms used therein which, under the plaintiff's theory and contention, had an accepted and established trade meaning, not contradictory of but entirely consistent with the contract. For such a purpose resort may always be had to parol evidence.

"The words of a contract are to be understood in their ordinary and proper sense unless by usage of trade or otherwise they have, in respect to the subject matter, acquired a peculiar meaning; and such meaning is not clearly inconsistent with the terms of the contract. * * * And this admission of evidence as to usage is not inconsistent

with the general rule that a written contract is not to be contradicted or varied by parol evidence." Elliott on Contracts, Sec. 1707.

"There are cases where usage is admissible to show the meaning of words which are used in a sense different from their ordinary meaning. This occurs where, by some usage of trade, words have acquired a peculiar meaning distinct from the popular meaning of the same words, or where the context evidently shows that they must be understood in some other special and peculiar sense. Under this rule, evidence is admissible to explain the meaning but not to contradict an instrument, and this, though no ambiguity exists on the face of the instrument. 'Such evidence is received on the theory that the parties knew of the usage or custom and contracted in reference to it, and in such cases the evidence does not add to or contradict the language used, but simply interprets and explains its meaning.' " Elliott on Contracts, sec. 1723.

In the case of *Richlands Co.* v. *Hiltebeitel,* 92 Va. 91, 94, 22 S. E. 806, 807, Judge Riely, speaking for this court, used the following language:

" 'Extrinsic evidence' it is said in Browne on Parol Evidence, sec. 57, 'is admissible in the construction of a mercantile contract, to show that phrases or terms used in the contract have acquired, by the custom of the locality, or by the usage of trade, a peculiar signification, not attaching to them in their ordinary use, and this whether the phrases or terms are in themselves apparently ambiguous or not.' And again it is stated in the same work (p. 216) that 'parol evidence is competent to annex to a contract a custom or usage of the business and locality, known to the parties, or so general and well settled as to be presumed to be known to them, and with reference to which they must be deemed to have contracted.' "

The case of *Rastetter* v. *Reynolds,* 160 Ind. 133, 66 N. E. 612, is much in point. In that case the court said:

"Appellant·insists that there was a contract between the parties in this case which was entirely clear and free from ambiguities, not subject to be varied by parol proof of custom or usage alleged to have existed in such business, and that, therefore, it was not proper for the appellees in their complaint to allege and by their evidence to prove, a usage intended to be explanatory of the language of the appellant's order. Common terms, however, may in a particular business or trade, acquire a peculiar and different signification from that generally given to them. It is perfectly well settled that, when parties enter into a contract with reference to a particular business or trade, they are presumed to have contracted with reference to the usages of that business or trade, and their contracts are to be interpreted consistently with such usage, unless by the express terms of the contract, the usage is excluded or is inconsistent with the contract * * *

"Contracts of the kind here involved may, on their face, seem clear, but in the particular instance, in connection with the business to which they pertain, be ambiguous. * * * In *Soutier* v. *Kellerman,* 18 Mo. 509, the contract called for the sale of shingles at a certain price per thousand, a perfectly clear expression ordinarily and abstractly considered, yet it was held competent to show that by the usage of the business, two bunches of shingles of certain dimensions, regardless of the number of shingles actually contained in the bunches, constituted a thousand, and that a delivery upon such a basis was within the terms of the contract."

The authorities to the foregoing effect are overwhelming. See *Richmond* v. *Barry,* 109 Va. 274, 281, 63 S. E. 1074; *Board of Trustees* v. *Bruner,* 175 Ill. 307, 51 N. E. 687; *Wood* v. *Allen,* 111 Iowa, 97, 82 N. W. 451; *Gosler*

v. *Eagle Sugar Refinery,* 103 Mass. 331; *Snoqualmi Co.* v. *Moynihan,* 179 Mo. 629, 78 S. W. 1014; 12 Cyc. 1081 *et seq.;* 4 Wigmore on Evidence, sec. 2440.

We shall not attempt to review the authorities cited for the plaintiff in error in support of the objection to the evidence in question. They are not in conflict with the views here expressed, but are not applicable to the facts of this case. There can be no doubt as to the rule that a usage or custom of either a trade or a locality, which would otherwise form a part of a transaction will equally form a part when the transaction has been embodied in a writing unless the terms of the writing clearly exclude the usage or custom; and, as said by Professor Wigmore (Vol. 4, sec. 2440), "the application of the rule in a given instance depends entirely on the nature of the transaction and the terms of the particular document, and precedents are of little service." In the instant case, we are of opinion that the trial court properly applied the rule.

But it is contended that the custom or usage invoked to determine the meaning of Winter Wheat Bran, as used in the contract, contravenes the provisions of the State and Federal statutes against the adulteration and misbranding of commercial feeding stuffs, and that for this reason the evidence of the custom or usage should have been excluded. There is, we think, no force in this position. It is not claimed that the screenings in this bran constituted an unlawful adulteration, nor that the tags which were in fact placed on the sacks, indicating the presence of screenings, constituted a misbranding. Conceding that the sale could not have been consummated in compliance with the State and Federal law without using tags or brands indicating the percentage of screenings contained in the bran there was nothing wrong or contrary to the law in selling the identical bran which was sold, assuming, as we may properly assume under the evidence and the finding of the

jury, that the parties understood the term Winter Wheat Bran to mean the commodity which was actually shipped. There is nothing in the statutes, State or Federal, to in any way interfere with the rules of evidence in cases where parties have employed trade terms having a definite meaning, even though these statutes require that meaning to be fully defined in the stamps placed on the goods. Whether Winter Wheat Bran would have been a sufficient designation of the wheat within the meaning of the statutory law is one question, and an immaterial one in this case. Whether Walker, as a dealer in commercial feeding stuff, in ordering Winter Wheat Bran from another dealer, must be held, under a general, long established and notorious custom of the trade, to have contracted for bran with screenings, is another and, in this case, a controlling question, which was submitted to the jury upon proper instructions and found against him.

It is further insisted that the defendant Walker had no actual knowledge of the custom or usage of the trade, and that it was not sufficiently certain, general and notorious to give rise to a presumption of knowledge on his part. In answer to this contention, it is only necessary to say that there was evidence tending to support the contrary view, and the verdict of the jury settled the question against the defendant.

The second assignment of error challenges the action of the court in giving Instruction No. 1, which was as follows:

"The court instructs the jury that in determining the intention with which the words 'Winter Wheat Bran' were employed by the parties to the contract in question, they may consider the circumstances under which the contract was entered into, including the negotiations leading up to it, the situation and business of the parties, and the usage of the dealers in feed stuffs that prevailed in the

city of Newport News at the date of the contract, if shown; and if the jury believe from the evidence that among dealers in bran in this city, including the defendant, it is understood that 'Winter Wheat Bran' contains a percentage of screenings, that then if the bran tendered the defendant was as good as the average Winter Wheat Bran sold on this market, and that this was the commodity contemplated by the parties to the contract, they will find for the plaintiff, and assess damages under other instructions herein."

The chief objection urged against this instruction is based upon the fact that it permits the jury to consider the usage of the trade in determining the meaning of the contract, and this has already been disposed of in discussing the first assignment of error. A second objection to the instruction is that it permits the jury to consider the circumstances under which the contract was entered into, including the negotiations leading up to it. It was, in our opinion, however, entirely proper to permit the jury to consider the situation of the parties and the circumstances leading up to the making of the contract for the purpose of determining whether the usage in question operated upon the minds of the parties in using the language which was employed in the contract.

"Courts, in the construction of contracts, look to the language employed, the subject matter, and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and, in that view, they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so to judge the meaning of the words and of the correct application of the language to the things described." 3 Jones Com. on Evidence, sec. 453. See also to same effect 9 Cyc. 587-8; 17 Cyc. 670; 10 R. C. L. p.

1041, sec. 235; *Richardson* v. *Planters' Bank*, 94 Va. 130, 137, 26 S. E. 413; Stephens Digest, Virginia Addition, 614, 615.

The true meaning of the terms of the contract depend upon controverted facts and conflicting evidence, and the question was, therefore, one for the jury, upon proper instructions, to determine. *Camp* v. *Wilson*, 97 Va. 265, 270, 33 S. E. 591; *Strause* v. *Richmond, &c., Co.*, 109 Va. 724, 729, 730, 65 S. E. 659, 132 Am. St. Rep. 937.

Nor do we think there is any force in the further objection urged against this instruction "that the fact that the commodity was as good as the average sold on this market would not be a fulfillment of the contract in controversy." Taking the instruction as a whole it is perfectly clear that this language therein was merely intended to explain to the jury that they were to determine from all the facts and circumstances in the case whether "Winter Wheat Bran" meant the commodity which was actually shipped to the defendant.

There were numerous other assignments of error, all subordinate to those already discussed, and all in our opinion, upon due consideration, without merit. We deem it unnecessary to enter into a discussion of any of them, further than to advert briefly to that phase of the fourteenth assignment which asserts that the verdict was contrary to the law and the evidence because, as plaintiff in error alleges, the subsequent sale of the rejected cars by The Gateway Milling Company was made unfairly and without any notice of the time and place to the defendant. So far as the unfairness of the sale is concerned, the evidence does not justify the charge. It is not too much to say that the record shows conclusively that after receiving the notice of rejection the Milling Company exercised every reasonable effort to make the best disposition possible of the bran. An earnest effort was made also to convince

Walker that he had not only gotten what he paid for but that he had received a commodity which was in itself as good as the best of its kind; that the market price therefor had increased since his purchase, and that it would be to his best interest to complete the contract. He declined to listen to these arguments and stood on his rejection. He was notified that the stuff would be sold at his risk, and there was no rule of law requiring that he should be given notice of the time and place of the sale. *American Hide & Leather Co.* v. *Chalkley*, 101 Va. 458, 463, 44 S. E. 705, and authorities there cited.

If the fact that the rejected bran finally sold for less than the contract price can be considered sufficiently material, as tending to warrant the course of the plaintiff in error, to call for any explanation, the explanation is not far to seek. His own conduct in refusing to accept it naturally and necessarily placed it at a disadvantage on the market. Besides, it had remained for weeks on the railroad yards and was subject to heavy demurrage charges, which any purchaser would have had to pay unless, as happened in *Hiden's Case*, he could use the bran for export purposes and thus remove the shipment from the influence of the demurrage rules.

We are of opinion that the judgment complained of is without error and it will be affirmed.

*Affirmed.*