𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## ALEXANDER v. CRITCHER.

### November 15, 1917.

1. CONTRACTS—*Construction—Surrounding Circumstances.*—In order to arrive at a correct construction of a contract, it is proper to consider the situation of the parties and the circumstances and negotiations which led to its execution.

2. BROKERS—*Contract for Sale of Real Estate—Share in Profits.*—Complainant purchased a large tract of mountain land at a judicial sale, and subsequently sold it to one G. for a price which netted him a substantial profit. Defendant held a lien upon this land and it was under a decree in a suit brought to enforce this lien that complainant bought the land upon the instigation of defendant, and complainant entered into a contract with defendant whereby he agreed to give to defendant a one-third interest in the profits upon a sale, made by the complainant, with the assistance of the defendant, of said lands, after all the costs and expenses had been paid, in consideration that the defendant should use his best efforts to make a sale of the property, show the property to prospective buyers, use his best efforts to keep fire off the property, and keep parties from robbing the same, and exercise in fact, a general supervision of the property, under the direction of the complainant. The course of dealings between complainant and defendant, as evidenced by their correspondence and otherwise, indicated that defendant was regarded, not merely as an agent, but an interested party. He continued to look after the physical protection of the property, was active and diligent in his efforts to make a sale, and responded promptly and helpfully when he was called upon in the preliminary negotiations which resulted finally in the sale to G.

   *Held:* That there was no error in the decree which awarded defendant one-third of the net profits arising from the sale to G., notwithstanding that the sale to G. was not made by defendant.

3. BROKERS—*Contract for Sale of Real Estate—Share in Profits.*—Under the circumstances set out in the preceding headnote the fact that defendant notified the purchaser, G., that he was

entitled to one-third of the money to be paid by him for the land, and warning him not to pay over this amount without defendant's consent, was not such an interference with the sale as would bar his right to one-third of the purchase money, defendant having reason to suppose that complainant would not keep the contract on his part; his duty did not require him to stand silently by and submit to a repudiation of the contract by complainant.

4. APPEAL AND ERROR—*Conclusiveness of Commissioner's Report—Conflicting Evidence.*—A commissioner's report, made upon conflicting evidence and approved by the trial court, will not be disturbed on appeal unless the error complained of is palpable.

5. JUDGMENTS AND DECREES—*Appeal and Error—Presumption in Favor of Decree on Conflicting Evidence.*—There is a presumption in favor of the decree of a trial court, and this presumption is entitled to especial consideration when the decree is based on uncertain and conflicting testimony.

6. HOMESTEAD EXEMPTION—*Fiduciary Debt—Appeal and Error—Harmless Error.*—Where complainant under the circumstances set out in the second headnote agreed that defendant should have one-third of the profits of the resale of land purchased at a judicial sale, although there arose from the transaction a fiduciary relationship and not a mere contract of employment between complainant and defendant, complainant was not such a fiduciary as is contemplated by the statute, Code of 1904, section 3630, clause 3, which provides that the homestead exemption shall not extend to any execution or process on a demand "for liabilities incurred by any public officer, or officer of a court, or any fiduciary, or any attorney at law for money received." A recital in the decree, therefore, against complainant, "homestead exemption waived by reason of the fact that this is a fiduciary debt due" from complainant to defendant is improper, and the decree should be corrected in this respect; but the error is probably harmless, since the record not only indicates that complainant is abundantly solvent, but also that the recovery complained of is now secured by an ample supersedeas bond, so that there is no reasonable probability that his homestead will ever be attacked to satisfy the decree.

Appeal from a decree of the Circuit Court of Rockbridge county. Decree for defendant. Complainant appeals.

*Affirmed.*

The opinion states the case.

*Hugh A. White, Timberlake & Nelson, J. A. Alexander* and *L. Travis White,* for the appellant.

*John Critcher, William A. Anderson* and *G. D. Letcher,* for the appellee.

KELLY, J., delivered the opinion of the court.

On the 21st of March, 1910, J. A. Alexander purchased a large tract of mountain land at a judicial sale, and subsequently sold it to G. F. Gray for a price which netted him a substantial profit. John Critcher claimed to be entitled to one-third of this profit. Alexander refused to recognize the claim. The circuit court, in the litigation which ensued, sustained Critcher, and Alexander brings this appeal.

The decision of the controversy hinges upon the construction of a written contract, dated April 18, 1910, between Alexander and Critcher, which, after reciting the original purchases by Alexander, sets forth the agreement between the parties as follows:

"And whereas the said party of the first part (Alexander) resides in Staunton, Virginia, a considerable distance from said land, and in order to keep parties from robbing the tract of timber and to keep off the fire and to effect a sale, the said party of the first part hereby agrees to give to the party of the second part a one-third (1-3) interest in the profits upon a sale, made by the party of the first part, with the assistance of the party of the second part, of said lands, after all the costs of purchase and expense of caring for said land, and expense of sale, taxes and every other expense has been paid, in consideration that the said party of the second part, shall use his best efforts to make a sale of the property, show the property to pros-

pective buyers, use his best efforts to keep fire off the property, and keep parties from robbing the same, in fact, a general supervision of the property, under the direction of the party of the first part."

There are no controverted questions of practice involved, but it will conduce to a clearer understanding of the difference between the parties to briefly outline the proceedings.

The litigation was begun by a bill in equity filed by Alexander after he had made the contract of sale with Gray, but before that contract had been fully carried into execution. This bill charged that Critcher had violated his contract obligations in all essential respects; that Alexander had therefore employed one Joseph A. Walker in his stead; that Critcher had not had anything to do with the property since Walker's employment, had not aided in making the sale to Gray, and was placing a cloud upon the title and interfering with the consummation of that sale by notifying Gray that he owned one-third of the land and must be accounted with accordingly. The bill prayed that Critcher be enjoined from interfering with the sale, and that the contract between him and Alexander be cancelled and annulled.

In reply Critcher filed an answer and cross-bill, setting out the history of his connection with the land and with the sale thereof to Alexander, and the circumstances leading up to the contract quoted above. He denied the main allegations in the bill, claimed one-third of the net profits of the sale to Gray, and prayed for an account and a decree for his share of the profits and for costs.

A number of depositions were taken on both sides, with which were filed many exhibits, consisting mainly of correspondence between Critcher and Alexander and between Critcher and certain other parties, and the cause coming on to be heard on the merits, the circuit court entered a

decree on November 8, 1913, awarding Critcher one-third of the net profits on the sale, and referring the cause to Commissioner W. T. Shields to ascertain the amount. The commissioner reported "that the one-third of the net profits to which the said John Critcher is entitled amounts to the sum of $2,491.35, with interest from December 12, 1912, subject to all proper costs chargeable thereon." To this report there were a number of exceptions by Alexander, and the court, on its own motion and in aid of its judgment, referred the cause, upon this report of Commissioner Shields and the exceptions thereto, to Commissioner Fitzhugh Elder, who filed a report which resulted in reducing the amount formerly found for Critcher to the sum of $1,804.05. This report was excepted to by Alexander and by Critcher, but all the exceptions were overruled, and the Shields report, as modified by the Elder report, was confirmed, and a decree was entered on May 1, 1916, in favor of Critcher for $1,804.05, with interest from December 12, 1912, and costs.

The fundamental question in the case turns, as we have seen, upon the meaning and effect of the written contract between Alexander and Critcher; and in order to arrive at a correct construction of this instrument, it is proper to consider the situation of the parties and the circumstances and negotiations which led to its execution. *Walker 1. Gateway Milling Co.*, 121 Va. 217, 92 S. E. 826, 829, and authorities there cited.

Critcher was a lawyer and a real estate speculator. He was familiar with the land and its title. The exterior lines embraced some twenty-one individual tracts, the title and boundaries of which were more or less involved and unsettled. For some time Critcher had looked upon the property as offering a good opportunity for legitimate investment and speculation, but had realized that if the opportunity was availed of, it would require an original cash

outlay in the purchase, and a subsequent expenditure of further capital and much personal care and attention in connection with clearing up the title, definitely establishing the boundary lines, and, in the meantime protecting the timber thereon against the two common enemies of such property, trespassers and mountain fires. He did not have the money to finance the project, and his plan was to find one or more associates who would furnish the money, utilize his information and assistance, and allow him to share in the profits which he was satisfied could be realized as soon as the title and boundaries were settled and the property in condition to attract purchasers. As attorney for one S. A. Moore, he held a lien upon this land, and, together with Mr. Curry, of the Staunton bar, he brought a suit to enforce this lien. The decree under which Alexander bought was rendered in that suit. In the outset, Mr. Moore, Mr. Curry and Mr. Critcher had under serious consideration the joint purchase of the property, in furtherance of the plan which Critcher had in view, but these other gentlemen finally abandoned the scheme. Mr. Curry, however, who was a friend of Critcher and was anxious to help him carry out the undertaking, which Mr. Curry evidently considered a legitimate and worthy attempt to develop the property as an investment, called Mr. Alexander's attention to the proposition, and thus the negotiations with Alexander began.

There is little room for doubt, under the evidence, that Alexander fully understood that Critcher expected and believed that he was to have a share in the profits of a resale which both he and his former associates, and later he and Alexander, had in contemplation. The land was bought as a speculation, and upon the representation of Critcher that it could be made to yield a profit; and this was plainly understood between him and Alexander as the reason for Critcher's interest and activity in finding a purchaser at

the judicial sale who would recognize his interest in the transaction. In his deposition, Alexander says: "Mr. Curry came to me, stating that Mr. John Critcher and himself had instituted court proceedings in Bath county, in which this tract of land was to be sold; that it would be sold on the 21st, that he wished to interest me in it because of Mr. Critcher, as I understood; and it further seemed to me that he wanted to find a purchaser as well. I had never heard of the land or of the sale of it prior to that date. Mr. Curry had quite a talk with me about the land, telling me what Mr. Critcher thought of it and what Mr. Critcher could do with it." Again he says: "After discussing the matter a good deal with Mr. Curry about what I might make out of it, or prospectively make out of it, and that Mr. Critcher would handle the property for me and that he thought he could get a good price, as I stated above, and he told me that Mr. Critcher wants to share in the profits with me, and I told him if Mr. Critcher could make that sort of a sale and take care of the property, that I would be willing to go into the matter and invest in it." After this conversation between Alexander and Curry, Critcher called on Alexander who describes their interview in part as follows: "Mr. Critcher told me that he had had the property for sale for quite a long time for Mr. Austin, but that there was $10,000 or more taxes on the land, and it was hard to do anything with it; that he felt sure if the taxes were removed and the title cleared up, that he could sell this property for $2 or $2.50 an acre, or something like that. * * * He discussed the possibilities of the property, and what it might bring, in his judgment, if it could be sold; that he wanted to get something out of the property; that he had been trying to sell the property for a long time; we, after a good deal of conversation, had a tentative understanding that I would go and look at the property and that if I thought it would be advisable to buy, that he

would take charge of the property and keep people off of it, look after it and keep fire off, and make sale of the property along the lines indicated by him, that I would give him one-third of all the net profits, in the event, however, that I considered it worth while trying to buy." It will be observed that in these statements, Alexander couples with his admission that Critcher was the moving spirit and was expected to share in the profits, a condition that Critcher was to sell the property for him. The written contract, however, did not so provide, as will be presently more fully pointed out.

Critcher took Alexander over the property, and, a day or two later, it was sold at public auction and Alexander became the purchaser. In making the first payment, he was assisted by a loan from Mr. Curry, who, as we have seen, had first been brought into the matter by Critcher and who was endeavoring to aid the latter in every way he could.

Immediately after the purchase by Alexander, and pursuant to the understanding between the parties, Critcher assumed general charge and supervision of the property, endeavoring to guard it against trespassers and to protect it against forest fires, and using his best efforts to make a sale. The written contract, as its date indicates, was not made until nearly a month later. It was prepared by Alexander, or under his direction. Critcher claims that he had some difficulty in getting the written contract and that this one was not as favorable to him as the previous understanding entitled him to have it. Alexander says in his deposition, "It was distinctly understood before the purchase that if I bought it I would let Mr. Critcher handle the land." It may be that Critcher wanted the contract to say as much and to give him the exclusive power of sale or some controlling voice as to price and terms. However this may be, the contract expressly contemplates "a sale

by the party of the first part with the assistance of the party of the second part." Under familiar rules of construction, the language of the contract must be taken most strongly against Alexander, and so construed as to give Critcher all that the words used are capable of passing to him. There is no stipulation that Critcher shall make the sale as a condition entitling him to a share in the profits. Bearing in mind the previous negotiations between the parties, and their situation at the time with reference to this property, the contract was appropriately expressed to carry out the common plan to which both parties had been working—a sale of the property for a profit, its protection in the meantime against damage from trespass and fire, and an ultimate division of the profit.

The subsequent conduct of the parties placed a practical construction upon this contract which fully sustains Crither's contention in this case. From the date of Alexander's purchase to that of his sale to Gray, the course of dealing between him and Critcher, as evidenced by their correspondence and otherwise, indicates that Critcher was regarded, not merely as an agent, but as an interested party. He continued to look after the physical protection of the property, was active and diligent in his efforts to make a sale, and responded promptly and helpfully when he was called upon in the preliminary negotiations which resulted finally in the sale to Gray. The employment of Walker, was not, as charged in the bill, due to any complaint then made of Critcher's supervision, and not to supersede, but to aid him. Walker was recommended to Alexander by Critcher as a surveyor, and although Alexander claims in his deposition that he understood Critcher was tired of the work and that, for this reason and because of Critcher's neglect, Walker was afterwards put in full charge, this statement is met by his own subsequent letter to Critcher, in which he said: "I am glad to get the

full account. I feel very much like taking strenuous action against those people. I employed Mr. Walker to help look after this tract because I knew that he knew the lines. I thought I had told you this, but I guess I had forgotten it when I saw you. * * * Now as Walker and you are on the ground you know best what to do. Stop those ties and use my name in any attachment or other proceedings."

A careful reading of the voluminous evidence upon ·the subject satisfies us that Critcher in good faith kept and performed his contract and did all that the parties thereto contemplated he should do to entitle him to one-third of the profits. It is manifest that his familiarity with the land was put to practical use by Alexander in directing the surveying and title work, and that there was the harmony and co-operation between these two parties which was to be expected of persons working to a common end with a common interest until after the contract had been made with Gray. The services, advice and assistance of Critcher had been so fully accepted and availed of by Alexander as that it would have been difficult if not impossible to deny his claim to share in the profits, even if the sale to Gray had been a transaction wholly independent of any knowledge or participation on the part of Critcher; but, as a matter of fact, he was called upon and responded promptly and satisfactorily in the preliminary negotiations which, beyond any question, resulted in that sale. These negotiations were begun through J. F. Tannehill, Jr., with whom Alexander had listed the property. Upon receiving an inquiry from Parkinson and Thrawl, of Ohio, for such a property, Tannehill mentioned the inquiry to Alexander and was referred to Critcher as the party who would show him the property or see that it was shown to him. Tannehill testifies that at this time Alexander told him that Critcher was interested in the property and stated in effect that he and Critcher were partners in it. Alexander

denies this, but, as the learned judge of the circuit court says in his written opinion, "Tannehill has no interest in this litigation; he is a witness of character and intelligence;" and we may add that his testimony is strongly corroborated by the probabilities to be drawn from the relationship between the parties and' their previous dealings with each other. Tannehill took Parkinson and Thrawl to see Critcher who spent the greater part of a day showing them over the property, and then introduced them to Walker, the surveyor who had been associated with him in looking after the property and who, by reason of the surveying he had done, was more familiar with the boundary lines. Later on, Parkinson visited the property again, bringing with him a timber expert named Gatz. Some question arose about an adverse claim to part of the property. Tannehill says: "Mr. Parkinson and Mr. Gatz seemed to doubt the advisability of buying the property, and Mr. Critcher explained to them the prior rights of Mr. Alexander to this land and seemed to satisfy them on that point, certainly better than I could have done." He further says that Critcher assisted him in the efforts to sell the property "in a very satisfactory way," and that he corresponded with Critcher considerably and "talked to him a great deal more about the sale than to Alexander." On the third visit to the property Parkinson was accompanied by Thrawl and Gray, and on this occasion also Critcher was active in his efforts to promote the sale.

We do not overlook the contention that Gray was not Tannehill's purchaser, and that Walker in fact made the sale and was paid for doing so, but Tannehill claimed and was paid a commission, and the evidence puts beyond the pale of controversy the fact that Critcher was active and materially helpful in his efforts to aid in making the sale, thus complying with his contract in this respect to the letter.

But it is contended, on behalf of Alexander, that if Critcher would otherwise have had a right to share in the profits, he forfeited it by endeavoring to interfere with and defeat the sale to Gray. We do not think this proposition can be maintained. After Critcher had helpfully and in good faith aided the negotiations which culminated in the sale, he was informed by Alexander that Gray had bought the land. This was in August, 1912. On October 15, 1912, Critcher wrote Alexander a letter, which so far as here material, was as follows: "It seems to me reasonable that I should have a statement of the receipts and expenditures in the matter of the Panther land, together with, substantially, the amount coming to me at the closing up of the sale to Gray, etc. What I would like is, how much it sold for, what expenses have attached, what sums to be paid others in connection with the sale, and to whom." Alexander replied on October 19th as follows: "I have been out of the city. Your letter and card received. I am too busy trying to get the deal with Mr. Gray closed to stop and take up the matter mentioned in your letter. I am not sure that the deal will be closed and if it is not there will be no need of taking up the other matter until it is closed. Then you come here and we will take up the other matter. I will not know whether the deal is closed or not until the 28th of November, 1912." This letter upon its face and standing alone does appear unreasonable or suspicious, but nearly two months had elapsed since the contract had been made with Gray, there are indications in the record tending to show that Alexander had not been dealing frankly with Critcher with reference to the matter, Critcher's suspicions as a matter of fact had been aroused, and, not being satisfied with Alexander's plea that he was too busy to attend to Critcher's request, the latter then wrote Gray as follows:

"I herewith notify you that I am entitled to one-third of the money to be paid by you (subject to all proper charges), for the 11,360 acres of land contracted for by you with J. A. Alexander, of Staunton, Va. I notify you of this, that you may not pay over this amt., one-third, of the agreed price, without my consent, this being notice of my equity in said sum and in the property. I concur in the sale, and do not wish to delay it. The purpose of this notice being simply to notify you, that I wish this proportion of the purchase price held by you until the amount is ascertained to which I am entitled. I am sure it is needless to add that your failure to observe the rights claimed by me would subject you to liability." If Critcher's suspicions were warranted this was a proper letter; and that they were warranted is conclusively shown by the bill which Alexander subsequently filed in this cause and in which he distinctly, and without qualification, takes the position that Critcher would under no circumstances have had any claim to share in the profits of this sale, and that he had actually severed all association with him, and substituted Walker in his stead, more than a year before that sale was made. The allegations of his bill cut off all escape from the conclusion that Alexander, when he made the contract with Gray and when he wrote the letter of October 19, 1912, intended to deny any claim on Critcher's part, and it is equally clear from the evidence that he was concealing this purpose from Critcher. His letter, therefore, while reasonable and innocent upon its face, appears in the light of subsequent developments to have been, just as Critcher believed, evasive and insincere.

The letter to Gray distinctly asserted Critcher's concurrence in the sale, and cannot be construed as an effort to interfere with its consummation. It was written, however, before the transaction was complete, and it caused some uneasiness and dissatisfaction on Gray's part. Subse-

quently, as Critcher naturally became more angered and aggressive because of Alexander's continued failure to acknowledge his claim and render him a statement, he made statements and wrote letters to persons more or less intimately connected with the transaction (none, however, directly to Gray) which were threatening and abusive in tone, and tended to endanger the final consummation of the sale. It must be remembered, however, that all this occurred after Alexander had resolved to violate his contract obligations with Critcher, and, moreover, that there was never a moment when Alexander could not have promptly removed all dissatisfaction and embarrassment with both parties, Gray as well as Critcher, by simply recognizing Critcher's interest and dealing with him in accordance with his contract rights. Critcher was loyal to his contract obligations so long as he had any reason to suppose that Alexander would keep the contract on his part; and his duty did not require him to stand silently by and submit to a repudiation of the contract by Alexander whereby he would necessarily have been deprived of his own rights. Fairly construed, we think all that Critcher did towards interfering with the sale to Gray amounted to no more than an assertion of his rights and an effort to protect them. It was not all done in good temper and good taste, but Alexander's attitude and allegations in this suit show conclusively that he made up his mind to ignore Critcher's claim; and the only excuse he now offers for concealing this purpose from Critcher for so long a time is that he had been advised to keep on friendly terms with Critcher because he was a vindictive man and would be likely to interfere with the sale of the property if his enmity was incurred.

There was, in our opinion, no error in the decree of November 8, 1916, which awarded Critcher one-third of the

net profits arising from the sale to Gray; and this disposes of the first and principal assignment of error.

The remaining assignments flow from the decree of May 1, 1916, confirming the report of Commissioner Shields as modified by that of Commissioner Elder. In so far as these remaining assignments are based upon the exceptions to the reports of the Commissioners, they depend almost exclusively upon controverted questions of fact. Some of them are not free from doubt. Upon the whole we are of opinion that the commissioner's report in its final form has gone as far in Alexander's favor as the evidence would at all justify; and the case in this respect is clearly within the influence of the rule that a commissioner's report, made upon conflicting evidence and approved by the trial court, will not be disturbed on appeal unless the error complained of is palpable. *Cottrell* v. *Mathews*, 120 Va. 847, 92 S. E. 808.

Upon much the same consideration we are constrained to overrule the assignment charging error in the date from which interest is allowed in Critcher's favor by the report and decree. The account was a difficult one to make up with accuracy and exactness, owing not only to the conflict of testimony but also, and in considerable degree, to Alexander's imperfect and inadequate record of his expenditures. The reports of the commissioners bear upon their face unmistakable evidence of a diligent and faithful effort to reach the right of the matter. There is a presumption in favor of the decrees of trial courts, and this presumption is entitled to especial consideration when the decree is based on uncertain and conflicting testimony. *Witt* v. *Creasey*, 117 Va. 872, 877, 86 S. E. 128. This presumption in the instant case is re-inforced by the carefully considered report of two commissioners. This conclusion renders it unnecessary to decide whether this ground of error, which was not raised below by exception or other-

93

wise, so far as the record shows, could be raised for the first time here.

The decree of May 1, 1916, awarding judgment against Alexander recited as to the recovery, "homestead exemption waived by reason of the fact that this is a fiduciary debt due from J. A. Alexander to John Critcher," and this is assigned as error. If the demand upon which the decree was based was one against which the homestead could not be claimed, then the recital in question, though irregular in phraseology, was proper in substance. Code 1904, section 3649-a. But, while we think there was a fiduciary relationship and not a mere contract of employment between Alexander and Critcher, we do not think Alexander was such a fiduciary as is contemplated by the statute, Code, section 3630, clause third, which provides that the homestead exemption shall not extend to any execution or process on a demand "for liabilities incurred by any public officer or officer of a court, or any fiduciary, or any attorney at law for money received." *Chapman* v. *Forsyth,* 2 How. (U. S.) 202, 11 Law Ed. 236, 6 Va. Law Reg. 196; *Cromer* v. *Cromer,* 29 Gratt. (70 Va.) 283. It was improper, therefore, to embody this recital, and the decree will be corrected in this respect; but the error is probably harmless, since the record not only indicates that Alexander is absolutely abundantly solvent, but also that the recovery complained of is now secured by an ample supersedeas bond, so that there is no reasonable probability that his homestead will ever be attacked to satisfy the decree.

It was insisted in the closing argument for the appellant at the hearing in this court that Critcher could have no standing in equity, because, as argued, the record shows (1) that he had made a champertous contract with his client Moore, and (2) that he did not deal honestly with Moore after bringing the suit. This contention was not raised in any way in the lower court, nor in the briefs filed

before us. Without further prolonging this discussion, we deem it sufficient to say that in our opinion, based upon a careful study of the record, the contention, even if material in this suit, is not sustained.

The other errors complained of have been duly considered. They are of minor importance and we need only to add that we find nothing in them to warrant a reversal of the decree. It will therefore be amended in the one particular already pointed out, and as thus amended will be affirmed.

*Affirmed.*