Present: All the Justices

WESTMORELAND-LG&E PARTNERS

OPINION BY
v. Record No. 961410      CHIEF JUSTICE HARRY L. CARRICO
June 6, 1997

VIRGINIA ELECTRIC AND POWER COMPANY

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Melvin R. Hughes, Jr., Judge

In an amended motion for judgment, Westmoreland-LG&E
Partners (Westmoreland) sought to recover from Virginia Electric
and Power Company (Virginia Power) damages resulting from
Virginia Power's alleged breach of a "Power Purchase and
Operating Agreement" (the Contract). Westmoreland appeals from
the award of summary judgment in Virginia Power's favor and the
dismissal of Westmoreland's action with prejudice.

Westmoreland makes three complaints on appeal. First,
Westmoreland says the trial court erred in holding that evidence
of trade custom and usage would not be permitted to explain the
meaning of certain contractual terms. Second, Westmoreland
contends the Contract is ambiguous and that the trial court erred
in ruling that parol evidence would not be allowed to show the
parties' intent and understanding with respect to certain of the
Contract's payment provisions. Third, relative to an alternative
basis for recovery, Westmoreland maintains the trial court erred
in failing to recognize that certain contractual language might
entitle Westmoreland to at least a partial recovery for Virginia
Power's alleged breach of the Contract.

The facts are not in dispute. Westmoreland, a Virginia
general partnership composed of Westmoreland Roanoke Valley, L.P.

and LG&E Roanoke Valley, L.P., is an independent power producer. Virginia Power is a public utility providing electrical service to its customers.

In the late 1970s, Virginia Power began purchasing electricity from independent power producers. In 1988, Virginia Power issued a request for proposals from a number of independent power producers, including Westmoreland, for the supply of electricity to Virginia Power. A model contract prepared by Virginia Power accompanied the request for proposals.

Westmoreland responded with a proposal, which Virginia Power accepted, and the two parties entered into the Contract on January 24, 1989.[1] On or about the same date, Virginia Power entered into agreements with approximately twenty other independent power producers as a result of its request for proposals.

In order to fulfill its obligations under the Contract, Westmoreland constructed a $300 million power plant, known as "ROVA I" (the Facility), near Roanoke Rapids, North Carolina.[2] The plant commenced commercial operations in May 1994 with the capacity to produce approximately 150 megawatts of electricity. Westmoreland is obligated under the Contract to supply this capacity to Virginia Power upon demand for a term of twenty-five

---

[1]The Contract was "amended and restated" in 1990 and 1991, but the provisions in issue here have remained unchanged since the 1989 version of the Contract was executed by the parties.

[2]Virginia Power operates in North Carolina under the name North Carolina Power. However, for convenience and clarity, we will continue throughout this opinion to refer to Virginia Power only.

years.

In the Contract, Westmoreland agrees to sell and Virginia Power agrees to purchase "the Net Electrical Output of the Facility."  Also, Westmoreland agrees to sell and Virginia Power agrees to purchase "Dependable Capacity from the Facility."  "Net Electrical Output" is defined in the Contract as "[a]ll of the Facility's generating output made available for sale."  "Dependable Capacity" is defined as "[t]he amount of capacity set by [Westmoreland based upon prescribed tests] and delivered from the Facility" to Virginia Power.

Under the Contract, Westmoreland must "control and operate the Facility consistent with [Virginia] Power's Dispatch of the Facility."  "Dispatch" is defined in the Contract as "[t]he right of [Virginia] Power . . . to schedule and control . . . the generating level of the Facility in order to commence, increase, decrease, or cease the delivery of Net Electrical Output" to Virginia Power.  When Virginia Power dispatches the Facility by providing notice to Westmoreland of the estimated needs for the following week, Westmoreland must comply with the notice.

Virginia Power is obligated by the Contract to make two types of payments to Westmoreland, one for net electrical output, termed "Energy Payments," and the other for dependable capacity, termed "Capacity Payments," based upon the different types of costs incurred by Westmoreland.  Energy Payments are designed to compensate Westmoreland for the actual amount of electricity it generates and delivers to Virginia Power and to reimburse Westmoreland for its variable costs incurred to produce the

electricity.

Energy Payments are not in dispute here, but Capacity Payments are. Capacity Payments are designed to compensate Westmoreland for the costs it incurred in constructing the Facility and for the fixed costs it incurs in operating and maintaining the Facility.

Under § 10.15(a) of the Contract, Virginia Power is required to make Capacity Payments in a fixed amount for a 25-year term, "so long as the plant is available as required by the Contract." Although paid monthly, the Capacity Payment is calculated at the rate of approximately $200,000 per day.

The present controversy arose when Virginia Power withheld Capacity Payments for each day it deemed to be a "Forced Outage Day" within the meaning of the Contract. In its amended motion for judgment, Westmoreland sought recovery for the total amount withheld by Virginia Power.

Section 1.18 of the Contract defines a "Forced Outage" as "[a]n interruption . . . of the Facility's delivery of the Net Electrical Output [that] is not . . . the result of a Scheduled Outage."[3] Section 1.20 defines a "Forced Outage Day" as

> [e]ach continuous twenty-four (24) hour period
> beginning with the start of a Forced Outage (regardless
> of the number of actual outages that may occur during
> such twenty-four (24) hour period(s))

> (a) designated by [Westmoreland] as a Forced
> Outage Day,

> (b) a Forced Outage Day which is determined

---

[3]The Contract allows 30 days annually for scheduled outages. Westmoreland says it is undisputed that Capacity Payments are "never reduced on account of Scheduled Outages."

pursuant to Section 10.15(d).

Section 10.15(d) forms the entire basis of Virginia Power's defense in this case. It is a unique section, found only in the contract involved here and not in the agreements Virginia Power executed with other independent power producers at or about the same time.[4] Section 10.15(d) provides as follows:

For each instance where [Westmoreland] fails, after the second oral notification (such notification shall not be less than fifteen (15) minutes from the first notification) from [Virginia] Power, to maintain the operating level specified by [Virginia] Power pursuant to Section 7.6, to within $\pm$ five (5%) percent of the Dispatched level then for each percent or portion of a percent deviation from the above allowed $\pm$ five (5%) percent, then at [Virginia] Power's option, the payment for that Day's Dependable Capacity shall be reduced two (2%) percent. If such deviation reduces that Day's payment for Dependable Capacity to zero (0) then that Day shall be a Forced Outage Day. Example: If the Facility is Dispatched at 100MW but is only able to deliver 87MW then the payment for Dependable Capacity for that Day would be reduced by 16%.

Because, under § 10.15(d), the 2% reduced payment scale applies to each percent of deviation from the dispatched level, or portion thereof, the reduction in the capacity payment reaches 100% and a Forced Outage Day occurs on any day when power generation falls below 46% of the dispatched level, giving credit for the $\pm$ 5% allowance. This is the result derived from the

_____

[4]The parties tell us on brief that the Model Agreement accompanying Virginia Power's request for proposals contained a provision that a Forced Outage Day would occur when the net electrical output deviated from the dispatched level by more than $\pm$ 5%. However, because Westmoreland planned to use a low grade fuel to generate electricity, with likely reductions in power output below 95% of the dispatched level, the parties agreed to the inclusion of § 10.15(d) in the Contract, which increased from 5% to 55% the permitted deviation from the dispatched level before a Forced Outage Day occurred.

formula, 100 - 5 = 95 - 45 = 50 x 2 = 100.

Sections 10.15(g) and 10.18 also relate to Forced Outage

Days.  Section 10.15(g) provides in pertinent part as follows:
[Westmoreland] shall be allowed thirty (30) Forced
Outage Days per full Capacity Test Period (May 1
through April 30). . . .  Payments for Dependable
Capacity will be reduced five hundred thousand
($500,000) dollars as liquidated damages for each
Forced Outage Day that occurred or was designated by
[Westmoreland] during that period in excess of the
above allowances.

And § 10.18 provides in pertinent part as follows:
The parties agree that [Virginia] Power will be
substantially damaged in amounts that will be difficult
or impossible to determine if the Facility:

. . . .

(d) Exceeds the allowed number of Forced Outage
Days in Section 10.15(g).

Therefore, to the limited extent set forth in the
Agreement, the Parties have agreed on sums which the
Parties agree are reasonable as liquidated damages for
such occurrences.  It is further understood and agreed
that the payment of the liquidated damages is in lieu
of actual damages for such occurrences.

The relationship between § 10.15(d) and the terms "Forced

Outage Days" and "Force Majeure Days" is also relevant to this

dispute.  Under § 14.1, a delay in performance occurring on a

given day is excused if Westmoreland designates such day a "Force

Majeure Day."  A Force Majeure Day may be designated when a delay

in performance is "due solely to circumstances beyond the

reasonable control of the Party experiencing such delay, [for

example,] acts of God; . . . war; riots; . . . or accidents."

A Force Majeure Day does not count against the thirty Forced

Outage Days allowed before the $500,000 per day liquidated damage

provision of § 10.15(g) may be invoked.  However, under
§ 10.15(b) of the Contract, if a forced outage is designated as
an event of Force Majeure, "then [Virginia] Power's obligation to
pay the payments for Dependable Capacity specified in Section
10.15(a) above shall cease, prorated daily, until the condition
of Force Majeure has been overcome."

In awarding summary judgment in Virginia Power's favor, the
trial court found that the Contract was unambiguous and,
therefore, that evidence of trade custom and usage as well as
parol evidence concerning the parties' intent and understanding
would be inadmissible.  The court found further that Westmoreland
had "failed to maintain power generation at greater than 45% of
the specified level" on the days for which it sought recovery.
Hence, the court held, § 10.15(d) of the Contract expressly
permitted Virginia Power to withhold Capacity Payments for those
days, including the days Westmoreland had designated as Forced
Outage Days, and to charge Westmoreland with all such days "for
the purpose of determining the liquidated damages provision of
the parties' contract pursuant to § 10.15(g)."

<u>Admissibility of Evidence</u>
<u>Concerning Trade Custom and Usage</u>

Westmoreland argues that it should have been permitted to
introduce evidence showing that "the terms 'Capacity Purchase
Price' and 'Forced Outage Day' have special meaning in the trade
custom and usage, under which the occurrence of such Days does
not diminish the monthly payment unless the annual Forced Outage
Day allowance is exceeded."  Westmoreland submits that "[t]his

trade custom and usage, reflected in all of the contracts resulting from the 1988 solicitation, 'form a part [of the Contract] ... unless the terms of the writing [clearly exclude] the usage or custom.'" (Quoting Walker v. Gateway Milling Co., 121 Va. 217, 224, 92 S.E. 826, 828 (1917)). Westmoreland maintains there is no language in the Contract that clearly excludes consideration of custom and usage.

Noting that the trial court excluded the evidence of trade custom and usage because it found the Contract unambiguous, Westmoreland cites Doswell Ltd. Partnership v. Virginia Electric & Power Co., 251 Va. 215, 468 S.E.2d 84 (1996), for the proposition that such evidence is admissible to show that contract phrases or terms have acquired a peculiar meaning by trade custom or usage "even though the phrases or terms themselves are unambiguous." Id. at 225, 468 S.E.2d at 90. Hence, Westmoreland concludes, the trial court erred in excluding its evidence of trade custom or usage.

While we confirm what we said in Doswell, we disagree with Westmoreland. In our opinion, Westmoreland has not met the threshold requirement for admission of the disputed evidence.

In Walker, supra, we said that evidence of trade usage is proper "to permit the jury to consider the situation of the parties and the circumstances leading up to the making of the contract for the purpose of determining whether the usage in question operated upon the minds of the parties in using the language which was employed in the contract." 121 Va. at 226, 92 S.E. at 829 (emphasis added). However, "knowledge of the

existence of the custom must be brought home to the [contracting parties], unless the evidence shows that it is so uniform and notorious at the place where the parties to be affected by it reside, as to raise a prima facie presumption that they knew of it."  Bowles v. Rice, 107 Va. 51, 55, 57 S.E. 575, 577 (1907).

Because the Contract and the other agreements resulting from the 1988 solicitation were made at or about the same time, what was done under the other contracts could not possibly have been brought home to, or have operated upon the minds of, the parties to the Westmoreland contract at the time of its execution.  In other words, Westmoreland has failed to establish the existence, at the time the Contract was executed, of any trade custom or usage relevant to the meaning of the language that was employed in the Contract.  The trial court did not err, therefore, in excluding evidence of trade custom and usage.

## Admissibility of Parol Evidence

Westmoreland contends that § 10.15(d) of the Contract is ambiguous, even when viewed in isolation, because it does not "define the financial consequence of treating a day as a Forced Outage Day."  And, Westmoreland says, when the Contract, including § 10.15(d), is read as a whole, it does not "unambiguously permit any reduction of the capacity purchase price on account of allowed Forced Outage Days."  Hence, Westmoreland concludes, "there was no justification for the Circuit Court's foreclosure of parol evidence of the parties' intent and understanding."

Virginia Power contends on the other hand that § 10.15(d) is

unambiguous.  Virginia Power says that the "2-for-1 reduced payment scale established by § 10.15(d) applies to all shortfalls in Westmoreland's generating capacity after the initial five percent variance."  Therefore, Virginia Power asserts, "[w]hen Westmoreland's generation is 45% or less of the Dispatched level, . . . Virginia Power has the right, in the words of § 10.15(d), to reduce 'that Day's payment for Dependable Capacity to zero (0).'"  This shortfall occurred, Virginia Power says, "on each day for which [it] made no Dependable Capacity payment" and, hence, it was excused from making payment for each of those days.

But, Virginia Power insists, even when § 10.15(d) is read along with the other provisions of the Contract, no ambiguity appears. "Those other provisions," Virginia Power says, "have nothing to do with the situation addressed by § 10.15(d) and do not make that section ambiguous."  Hence, Virginia Power concludes, the trial court did not err in excluding parol evidence of the parties' intent and understanding.

"The question whether a writing is ambiguous is one of law, not of fact."  Tuomala v. Regent University, 252 Va. 368, 374, 477 S.E.2d 501, 505 (1996).  Thus, "we are not bound by the trial court's conclusions on this issue, and we are permitted the same opportunity as the trial court to consider the contract provisions."  Id.

In Doswell, supra, we reiterated the principle that "'[p]arol evidence of prior or contemporaneous oral negotiations are generally inadmissible to alter, contradict, or explain the terms of a written instrument provided the document is complete,

unambiguous, and unconditional.'"  251 Va. at 222, 468 S.E.2d at

88 (quoting Renner Plumbing, Heating & Air Conditioning, Inc. v.

Renner, 225 Va. 508, 515, 303 S.E.2d 894, 898 (1983)).  We also

said in Doswell:

> Contracts are not rendered ambiguous merely because the
> parties or their attorneys disagree upon the meaning of
> the language employed to express the agreement.  Even
> though an agreement may have been drawn unartfully, the
> court must construe the language as written if its
> parts can be read together without conflict.
>
> And, parol evidence may not be used to first
> create an ambiguity and then to remove it.  Finally, an
> agreement is not rendered ambiguous merely because it
> deals with a technical subject that may be considered
> complex to the uninformed lay person who is not
> familiar with the topic.

Id. at 222-23, 468 S.E.2d at 88-89 (citations omitted).

"A contract must be construed as a whole to determine the

parties' intent with respect to specific provisions."  Hooper v.

Musolino, 234 Va. 558, 569, 364 S.E.2d 207, 212, cert. denied,

488 U.S. 823 (1988). "No word or clause in the contract will be

treated as meaningless if a reasonable meaning can be given to

it, and there is a presumption that the parties have not used

words needlessly."  D.C. McClain, Inc. v. Arlington County, 249

Va. 131, 135-36, 452 S.E.2d 659, 662 (1995).

"'An ambiguity exists when language admits of being

understood in more than one way,'" Doswell, 251 Va. at 222, 468

S.E.2d at 88 (quoting Renner, 225 Va. at 515, 303 S.E.2d at 898),

or when "'language is of doubtful import,'" Galloway Corp. v.

S.B. Ballard Constr. Co., 250 Va. 493, 502, 464 S.E.2d 349, 355

(1995) (quoting Allen v. Green, 229 Va. 588, 592, 331 S.E.2d 472,

475 (1985)).  And an award of summary judgment is improper when

"neither party has offered a construction of [contractual] provisions that could be deemed so clear that it unambiguously excludes the explanation offered by the opponent." Cascades North Venture Ltd. Partnership v. PRC Inc., 249 Va. 574, 582, 457 S.E.2d 370, 374-75 (1995).

Guided by these principles, we reach the conclusion that the Contract is ambiguous. In the first place, the language of § 10.15(d), even when read in isolation, admits of being understood in more than one way, Doswell, 251 Va. at 222, 468 S.E.2d at 88, and, hence, is of doubtful import, Galloway, 250 Va. at 502, 464 S.E.2d at 355.

The penultimate sentence of § 10.15(d) contains the crucial language. The sentence states that "[if the deviation from the dispatched level on a given day] reduces that Day's payment for Dependable Capacity to zero (0) then that Day shall be a Forced Outage Day." If emphasis is placed upon the words, "reduces that Day's payment for Dependable Capacity to zero," the language of (d) may be taken to mean that the result of such a deviation would be no capacity payment for that day. If, however, emphasis is placed upon the words, "then that Day shall be a Forced Outage Day," the language of (d) may just as well be taken to mean that the only result of such a deviation would be the counting of the day in question against the thirty Forced Outage Day allowance provided by § 10.15(g) before the $500,000 per day liquidated damage provision may be invoked.

Hence, this case presents a situation in which "neither party has offered a construction of these provisions that could

be deemed so clear that it unambiguously excludes the explanation offered by the opponent." Cascades North Venture, 249 Va. at 582, 457 S.E.2d at 374-75. This alone is sufficient to justify the admission of parol evidence concerning the parties' intent and understanding at the time they entered into the contract.

However, there is more. When § 10.15(d) is read in context with other provisions of the Contract, the ambiguity becomes even more apparent. First, a reading of § 10.15(b) demonstrates that when the parties wished to make clear under what circumstances Virginia Power would not be obligated to make Capacity Payments for a Forced Outage, they knew how to accomplish the task, using clear and precise language. Section 10.15(b) states that when Westmoreland "designates [a] Forced Outage as an event of Force Majeure, then [Virginia] Power's obligation to pay the payments for Dependable Capacity . . . shall cease."[5] As Westmoreland suggests, the absence of such an explicit provision in § 10.15(d) casts doubt upon the correctness of Virginia Power's assertion that § 10.15(d) unambiguously relieves it from the obligation to make Capacity Payments for all Forced Outage Days, however they occur.

Virginia Power argues that § 10.15(b) is consistent with § 10.15(d) in that both "relieve[] Virginia Power of any obligation to pay Westmoreland for capacity Virginia Power does not receive." However, this assumes the correctness of Virginia

---

[5]Similarly, § 5.3 of the Contract provides that Virginia Power "shall not be obligated to make payments for Dependable Capacity" during periods allowed to cure defaults under the Contract.

Power's position and begs the question to be decided, i.e., whether § 10.15(d) really does relieve Virginia Power of the obligation to make Capacity Payments for Forced Outage Days occurring under § 10.15(d).

Virginia Power also argues that § 10.15(d) applies only to those days on which Westmoreland's facility is dispatched to produce electrical power while § 10.15(b) applies even if Westmoreland is not so dispatched. But this argument misses the point, viz., if it was necessary to say explicitly in § 10.15(b) that Capacity Payments cease for Force Majeure Days occurring under that section, was it not just as necessary to say explicitly in § 10.15(d) that payments cease for Forced Outage Days occurring under that section? In any event, we do not think it appears as a matter of law that the distinction drawn by Virginia Power would make a difference in its obligation with respect to Capacity Payments for Forced Outage Days, but perhaps parol evidence submitted by the parties on remand will reveal whether the distinction was intended to make a difference.

Second, § 10.15(g) allows Westmoreland thirty Forced Outage Days annually before the provision for liquidated damages in the amount of $500,000 per day may be invoked. Section 10.18 provides that "the payment of the liquidated damages is in lieu of actual damages" Virginia Power may suffer if Westmoreland "[e]xceeds the allowed number of Forced Outage Days in Section 10.15(g)." As Westmoreland maintains, these provisions support the implication that liquidated damages may be the only penalty Westmoreland must suffer for Forced Outage Days, and such an

implication is completely inconsistent with Virginia Power's position that § 10.15(d) permits it to withhold Capacity Payments for all Forced Outage Days in addition to collecting $500,000 per day in liquidated damages if the number of such days exceeds the thirty days allowed annually.

Virginia Power says, however, that § 10.15(g) "relates to a different subject matter than § 10.15(d)," that "[n]either section refers to the other," and that § 10.15(g) "has nothing whatsoever to do with Virginia Power's obligation to make Dependable Capacity payments."  However, both sections mention and deal with the subjects of Forced Outage Days and payments for Dependable Capacity -- § 10.15(d) states that a Forced Outage Day occurs when the deviation on a particular day reduces that day's Dependable Capacity payment to zero and § 10.15(g) states that payments for Dependable Capacity will be reduced by $500,000 for each Forced Outage Day that exceeds the thirty-day allowance.

Moreover, § 10.15(d) is implicitly incorporated by reference into § 10.15(g) because, in its final sentence, the latter section states that "[p]ayments for Dependable Capacity will be reduced five hundred thousand ($500,000) dollars as liquidated damages for each Forced Outage Day that _occurred_ or was _designated_ by [Westmoreland] during [a capacity test] period in excess of the above allowances."  (Emphasis added.)  If a Forced Outage Day is not designated by Westmoreland, it can only _occur_ as a result of the reductions required by the sliding scale set forth in § 10.15(d).

Therefore, it is not correct to say categorically, as

Virginia Power would have us say, that § 10.15(g) has "nothing whatsoever to do with Virginia Power's obligation to make Dependable Capacity payments." Rather, Westmoreland should have the opportunity to show by parol evidence on remand what the parties intended by the language they employed in the Contract.

We hold that it was error for the trial court to exclude parol evidence concerning the parties' intent and understanding with respect to Forced Outage Days and Capacity Payments at the time they executed the Contract.

## Alternative Basis of Recovery

Westmoreland's amended motion for judgment contained an alternative claim of breach of contract for Virginia Power's withholding of Capacity Payments for days that Westmoreland designated as Forced Outage Days pursuant to § 1.20(a) of the Contract. The trial court's award of summary judgment in favor of Virginia Power encompassed this alternative claim.

Under § 1.20, a Forced Outage Day occurs when "(a) designated by [Westmoreland] as a Forced Outage Day," or "(b) determined pursuant to Section 10.15(d)." Westmoreland argues that "[e]ven if § 10.15(d) could be read as depriving [it] of [capacity] payments attributable to days that are classified as Forced Outage Days by [the section's] own operation, its impact [should] be limited to such days." Hence, Westmoreland concludes, it was "entitled, at a minimum, to a judgment for the amount attributable to the days covered by § 1.20(a)." Virginia Power says the trial court did not err in denying Westmoreland a partial recovery for designated days.

The trial court stated no reason for the inclusion of Westmoreland's alternative basis for relief in its award of summary judgment. As Westmoreland suggests in a footnote to its brief, the trial court's disposition of this phase of the case may have been inextricably entwined in the court's conclusion that § 10.15(d) unambiguously "permits Virginia Power not to make dependable capacity payments on days for which [Westmoreland] seeks payment," which necessarily included Forced Outage Days designated by Westmoreland pursuant to § 1.20(a). Since we hold _supra_ that the Contract is ambiguous, we think the trial court on remand, if Westmoreland is unsuccessful on its principal claim for breach of contract, should have the opportunity to consider further the question whether Virginia Power is entitled to withhold Capacity Payments for Forced Outage Days designated by Westmoreland pursuant to § 1.20(a).

## Conclusion

We will affirm the trial court's action in excluding evidence of trade custom and usage. For the error in excluding evidence concerning the parties' intent and understanding with respect to Forced Outage Days and Capacity Payments, we will reverse the judgment of the trial court and remand the case for further proceedings consistent with the views expressed in this opinion.

_Affirmed in part,
reversed in part,
and remanded._
