# CIRCUIT COURT OF THE CITY OF RICHMOND

Westmoreland-LG&E Partners

v.

Virginia Electric and Power Co.

## Case No. LX-2859-1

September 2, 1998

BY JUDGE MELVIN R. HUGHES, JR.

I have read and considered the materials both sides have submitted on the question of disclosure of the Brown letter, including, of course, the letter, which came with plaintiff's material under seal for *in camera* review. The question is whether the attorney-client privilege, which plaintiff asserts protects the letter from disclosure to defendant, applies. Brown wrote the letter in draft format then sent it to Folkes, who is with a different company, who in turn gave it to his company's lawyer, Schenk, for review and comment. Schenk advised against sending the letter. This advice was followed and the letter was not sent.

It is interesting that Schenk is not Brown's counsel but rather counsel for Folkes' company and that the letter first went to Folkes without first being reviewed by Brown's in-house counsel. The court must accept the reality of the situation, however, that the respective companies were partners on the project sharing a common concern. Brown's and Folkes' purpose in the transfer to counsel was to secure legal advice from counsel, Schenk, who, it turned out, advised against sending the letter. To hold otherwise would frustrate the purpose behind the attorney-client privilege — to encourage a client to confide in his lawyer and give a full disclosure and secure fully informed legal advice. See *Fisher v. United States*, 425 U.S. 391, 403-404 (1976).

For the foregoing reasons the disclosure of the Brown letter will not be allowed.

December 2, 1998

BY JUDGE T. J. MARKOW

The court, sitting without a jury, heard the evidence and argument, and received memoranda on the issues joined. At issue is the interpretation of a contract between Westmoreland-LG&E Partners ("WLP") and Virginia Electric and Power Company in which WLP undertook to construct a power generating plant and to produce electricity for Virginia Power in consideration of two types of payments. The first type (at issue here) are called "dependable capacity" payments. The second are the "energy purchase price." WLP claims that Virginia Power breached the contract by withholding dependable capacity payments of some fourteen million eight hundred thousand dollars.

The dependable capacity payment is designed to compensate for providing a generating facility available for the delivery of electricity to Virginia Power upon call or "dispatch." It is designed to cover construction and financing costs, as well as anticipated profits. The dependable capacity payment amounts to about two hundred thousand dollars a day.

The contract anticipates that there will be times when the plant will not be able to produce because of the need for maintenance of the equipment ("scheduled outage days"), for unforeseen impediments to production ("forced outage days"), and for "force majeure" events. There is no dispute that because of allowances in the contract, WLP receives the dependable capacity payments for "scheduled outage days" and nothing for "force majeure" days.

The issue here is whether it receives such payments when it experiences "forced outage days." Interpretation of section 10.15(d) of the contract determines the answer to that question.

Based upon the decision of the Virginia Supreme Court in an appeal of a prior decision of this court, the purpose of this trial was to hear evidence "concerning the parties' intent and understanding with respect to Forced Outage Days and capacity payments at the time they executed the contract." *Westmoreland-LG&E Partners v. Virginia Electric & Power Co.*, 254 Va. 1, 9, 486 S.E. 289, 296 (1997).

At trial, each side presented witnesses who were involved in negotiating the contract and who testified regarding their personal recollections of discussions and their objectives in the negotiations which led to this contract. Because of the lapse of time (the negotiations occurred in late 1988), personal motivations, the frailty of memories, and the inherent difficulty of attributing the intent of a few to the act of several, this court as fact finder considered and gives some, but little, weight to the testimony of the personal intentions of a

particular witness or the witnesses collectively. Instead, the focus and greater weight is placed on more objective evidence such as the historical background of the contract, the circumstances surrounding the negotiations, and the language used and its relation to the contract as a whole. Accordingly, this opinion will focus little, if at all, on the testimony of any particular witness.

The analysis begins with the historical context of the contract, the negotiations, and, finally, the executed document.

In early 1988 Virginia Power decided to expand its power production through the use of independent power producers in lieu of building and operating its own plants. Requests for proposals for contracts were sent out in the spring of 1988. WLP responded with a proposal that culminated in this contract.

The original party in the proposal was a partnership comprised of three entities. After the contract was executed, two of the partners withdrew and the contract was amended and restated in 1990 and 1991. As the operative section was unchanged, the court is focusing on that section in the light of the 1988/89 circumstances. While WLP did not exist in 1988, this discussion will treat it as the original contracting party.

WLP's proposal was based upon its use of "gob" coal, a low cost waste coal product. It proposed a very high dependable capacity payment (about twice that of other producers) and a very low production cost for the electricity produced.

In its request for proposals, Virginia Power included a model contract which formed the basis of the contract in question. It contemplated that dependable capacity payments would be made for "scheduled outage days" and for up to twenty-five "forced outage days." Beyond these allowances, outages would cost the operator $2.2 million a day in liquidated damages.

In its proposal, WLP attempted to address several concerns. Because of the untried technology it planned to use to burn the gob coal, WLP was unsure that it would meet the twenty-five days per year allowable forced outage limit. It considered the $2.2 million per day liquidated damages excessive. WLP, therefore, wanted more forced outage days for the start-up period to "work the bugs out," it wanted a higher dependable capacity payment, and it wanted reduced liquidated damages for outages beyond the allowed number.

Virginia Power's primary objective was to provide incentives for WLP to operate as much as possible because Virginia Power was paying it very high capacity payments and very low production payments.

Neither side was satisfied with the contract until December 20, 1988, when one of WLP's negotiators proposed the so-called "sliding scale" which found its way into what is now § 10.15(d) of the contract which states:

(d) For each instance where Operator fails, after the second oral notification (such notification shall not be less than fifteen (15) minutes from the first notification) from North Carolina Power, to maintain the operating level specified by North Carolina Power pursuant to Section 7.6, to within five (5%) of the Dispatched level then for each percent or portion of a percent deviation from the above allowed five (5%) percent, then at North Carolina Power's option, the payment for that Day's Dependable Capacity shall be reduced two (2%). *If such deviation reduces that day's payment for Dependable Capacity to zero (0) then that Day shall be a Forced Outage Day.* Example: If the Facility is Dispatched at 100MW but is only able to deliver 87MW then the payment for Dependable Capacity for that Day would be reduced by 16%. [Italics added.]

The negotiations also resulted in reduction of liquidated damages from $2.2 million per day to $500,000 per day, the ability of WLP to carry over some forced outage days and its higher capacity payments. WLP also got up to thirty forced outage days without incurring liquidated damages.

The dispute arises over the interpretation of the underlined sentence in § 10.15(d). Virginia Power construes the language to mean that if WLP delivers power at less than 46% of what is ordered, its dependable capacity payment for that day is zero and WLP uses one of its forced outage days. It has withheld some $14,800,000 for 72 days since May 1994 on which WLP operated at less than 46%.

WLP argues that, when the power delivered is less than 46%, it suffers a forced outage day which carries no financial consequence until it has experienced more than thirty forced outage days in a year. It has never experienced that many forced outage days in a year and therefore demands judgment for the full amount withheld, plus interest.

One of the chief objectives of Virginia Power in the negotiations was to keep the plant "on line" as long and as often as possible considering the low power cost and the high dependable capacity payment. Virginia Power's interpretation of § 10.15(d) certainly accomplishes that objective. By contrast, however, WLP's major objectives of high capacity payments and less punitive liquidated damages would have been achieved only at a most significant cost; i.e., the loss of dependable capacity payments on all forced outage days. This consequence was never specifically negotiated or even discussed by the negotiators.

In modifying the model agreement, as resulted in § 10.15(d), the parties evidenced an intention to avoid the liquidated damages situation when WLP was able to partially deliver power.

Facially, one purpose of § 10.15(d) was to provide another means of defining a forced outage day; i.e., where there is less than a complete interruption but production is less than 46% of that dispatched.

If each forced outage day resulted in no dependable capacity payment as Virginia Power contends, there is little reason for § 10.15(g) which allows the operator not less than thirty forced outage days per year (and a more complex formula for allowances during the first years of operation) and which provides "Payments for Dependable Capacity will be reduced five hundred thousand ($500,000) dollars as liquidated damages for each forced outage day that occurred or was designated by Operator during that period in excess of the above allowances."

Virginia Power's interpretation would result in a cost of $700,000 per each forced outage day over thirty; i.e., $200,000 Dependable Capacity payment, plus $500,000 in liquidated damages. These consequences were never discussed between the parties, nor were they in addition to the $6,000,000, loss in dependable capacity payments for the first thirty forced outage days included in the model agreement.

The language of § 10.15(d) which poses the problem here means simply that WLP produces as long as it can until its production is less than 46%. Virginia Power pays a reduced Dependable Capacity Payment in accord with the 2% reduction for each 1% reduction in electricity produced. When production is below 46%, a forced outage day is automatically produced which counts toward the thirty per year allowed in § 10.15(g). WLP receives the dependable capacity payment for that forced outage day.

Virginia Power's construction places WLP in a double penalty situation. It gets no payment *and* it is charged with a forced outage day. Nothing in the evidence supports an intention from either party to reach that result.

Judgment will be rendered for WLP for $14,800,000 plus interest.