**RIVERTON INVESTMENT CORP., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CIV. A. 5:99CV00089.**

United States District Court, W.D. Virginia, Harrisonburg Division.

March 6, 2001.

Michael Eugene Derdeyn, McGuire, Woods, Battle & Boothe, Charlottesville, VA, Warren Eugene Zirkle, McGuire, Woods, Battle & Boothe, Richmond, VA, for Plaintiff.

Thomas L. Eckert, U.S. Atty's Office, Roanoke, VA, Angelo Frattarelli, Washington, DC, for Defendant.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

This is a tax refund case. The plaintiff alleges that payments it made to its employees to buy back previously-issued stock were not non-deductible payments made to redeem stock, but deductible payments for compensation. On cross-motions for summary judgment, the presiding United States Magistrate Judge recommended that the court enter judgment in favor of the United States. The plaintiff filed timely objections.[1]

Although buying back previously-issued stock intuitively appears to be a "redemption" of stock, a closer examination of the matter reveals that the employees never owned the stock to a sufficient degree in the first instance, and that, therefore, the plaintiff never redeemed it. Consequently, the court holds that the Internal Revenue Service wrongfully characterized the payments as non-deductible redemptions of stock. The plaintiff's objections shall be sustained, the Magistrate Judge's Report and Recommendation shall be rejected, and judgment shall be entered in favor of the plaintiff.

## I. BACKGROUND

### A. FACTS AND PROCEDURAL HISTORY

Plaintiff Riverton Investment Corporation ("RIC") was formed in 1980 as a holding company for the purpose of purchasing all of the outstanding stock of Riverton Corporation ("Riverton") from

---

1. The United States also filed an objection, but only to correct a factual statement in the Report and Recommendation. Because the court does not herein adopt the Magistrate Judge's factual findings, the United States's objection shall be denied as moot.

Riverton's then-parent company. To gain management support for the transaction, Riverton's president developed a plan to encourage Riverton's management to invest in RIC, while insulating the investment from the risk of devaluation. The final version of this plan was the Management Stockholder's Agreement of December 26, 1980 ("MSA"), which was entered into between RIC and several Riverton managers (the "management stockholders").

In the 1980s, RIC issued stock to the management stockholders pursuant to the MSA. In the 1990s, upon termination of the management stockholders' employment and pursuant to the MSA, RIC bought back the management stockholders' stock for 60% of the shares' book value. On their tax returns, both the management stockholders and RIC reported these buy-back payments in a manner consistent with such payments being for "compensation," and not as payments made in redemption of stock. RIC attempted to deduct the payments as ordinary business expenses. The Internal Revenue Service ("IRS") disallowed the deductions, reasoning that the 1990s payments were not compensation, but non-deductible redemptions of stock. RIC paid the tax the IRS claimed was owed, and then instituted this action for a refund. *See* 26 U.S.C.A. § 7422 (West 1989 & Supp.2000); 28 U.S.C.A. § 1346(a)(1) (West 1993 & Supp. 2000).

The case was referred to the Magistrate Judge for findings of fact and a recommended disposition of dispositive motions. *See* Fed.R.Civ.P. 72(b); 28 U.S.C.A. § 636(b)(1)(B) (West 1993 & Supp.2000). The parties filed cross-motions for summary judgment, and the United States filed a motion to strike parol evidence that RIC offered to explain the meaning of the MSA. In his Report and Recommendation,

the Magistrate Judge recommended that the court grant the United States's motion for summary judgment and its motion to strike, and enter judgment in the United States's favor. The plaintiff filed timely objections, *see* Fed.R.Civ.P. 72(b), which are now before the court and ripe for disposition.

The parties agree that the overarching issue presented in this case is whether RIC "transferred" stock to its management employees in the 1980s. If RIC did not "transfer" the stock in the 1980s, then the 1990s payments were not "redemptions" of the stock, and RIC should have been allowed to deduct the 1990s payments. If RIC did "transfer" the stock in the 1980s, then the 1990s payments were "redemptions" of the stock, and the IRS properly disallowed RIC's deductions for the 1990s payments.

## B. MSA PROVISIONS

The question of whether RIC transferred the stock to its employees in the 1980s depends on the degree to which the M.S.A. § restricted the employees' ownership interest in the stock. The most pertinent article of the M.S.A. § is Article II, the purpose of which was to "permit[ ] RIC to buy, and Management Stockholders to sell, Management Stock upon termination of employment." (Joint Stip. Ex. 4 (hereinafter "MSA") at 4.) To this end, Article II contained the following rights and restrictions, among others.

Paragraph 2 of Article II restricted the management shareholders' ability to transfer the stock. Each management stockholder was prohibited from transferring his stock except: (1) back to RIC, "upon the terms and conditions as hereinafter provided," and (2) "as permitted under paragraph 10," (MSA at 5), which allowed transfers to family members, as long as the transferee took the stock subject to

the terms of the M.S.A. § (*i.e.* the family member would have to sell the stock back to RIC).

Paragraph 4 of Article II prescribed that, "upon the termination of employment" of a management stockholder, the management stockholder was required to sell his stock back to RIC, and RIC was required to buy it.

Paragraph 5 of Article II restricted the price at which RIC would buy back the stock on termination of employment. The buy-back price was established as the greater of either the original price the management stockholders paid for the stock, or 60% of the stock's book value as of the termination of employment. By this arrangement, the management shareholders could benefit from an increase in the book value of the stock (by selling for 60% of the book value), but would be insulated from a decrease in the book value of the stock (by selling the stock back for no less than they paid for it).

Paragraph 9 of Article II is the genesis of the instant dispute. It reads, *in toto:*

> 9. *Certain Corporate Transactions.* The provisions hereof relating to Termination of Employment and the effects thereof shall not be effective with respect to any liquidation, merger, acquisition or other reorganization by or affecting RIC. With respect to such transaction, the Management Stockholders then employed shall have the rights and obligations, and only the rights and obligations, of RIC common stockholders of RIC who are not Management Stockholders.

(MSA at 10.)

## C. STATUTORY AND REGULATORY BACKGROUND

■ The Internal Revenue Code provides that ordinary business expenses, such as expenses paid for salaries or for other compensation for services rendered, may be deducted by a business. *See* 26 U.S.C.A. § 162(a) (West 1988 & Supp. 2000). However, "[i]f an expense is capital, it cannot be deducted as [an] 'ordinary and necessary' ... business expense under § 162 ...." *Woodward v. Comm'r of Internal Revenue,* 397 U.S. 572, 575, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970). As a general rule, stock redemptions "are characterized as capital transactions, and the purchase price of a stock redemption is not deductible." *United States v. Houston Pipeline Co.,* 37 F.3d 224, 226 (5th Cir.1994) (footnote omitted).

The parties agree that the question of whether the payments RIC made to the management stockholders in the 1990s were deductible payments for compensation, or non-deductible payments to redeem stock, depends on whether the stock was originally "transferred" to the management stockholders in the 1980s. Otherwise said, if RIC did not "transfer" the stock to the management stockholders in the 1980s, then RIC did not "redeem" the stock in the 1990s.

The parties also agree that the regulations accompanying 26 U.S.C.A. § 83 (West 1988 & Supp.2000) govern whether a "transfer" of stock occurred for tax purposes in the 1980s. Treasury Regulation 1.83–3(a)(1) states that "a transfer of property occurs when a person acquires a beneficial ownership interest in such property (disregarding any lapse restriction, as defined in § 1.83–3(i))." 26 C.F.R. § 1.83–3(a)(1) (2000).

The question in this case is whether the restrictions contained in Paragraphs 2, 4, and 5 of the M.S.A. § (restrictions on when and to whom the stock could be transferred, and maximum and minimum restrictions on the purchase price) (collectively, the "MSA Restrictions"), restricted

the management stockholders' ownership interest in the stocks they acquired in the 1980s to such a degree that their acquisition of the stock did not qualify as a "transfer" of the stock. Some indications that no transfer occurred are that the "property is transferred under conditions that require its return upon the happening of an event that is certain to occur, such as the termination of employment," *id.* § 1.83–3(a)(3), that "the consideration to be paid the transferee upon surrendering the property does not approach the fair market value of the property at the time of surrender," *id.* § 1.83–3(a)(5), or that "the transferee does not incur the risk of a beneficial owner that the value of the property at the time of transfer will decline substantially," *id.* § 1.83–3(a)(6).

Treasury Regulation 1.83–3(a)(1), quoted above, establishes a critical distinction between "non-lapse" restrictions, which are considered in determining whether someone acquires a sufficient ownership interest in property for a "transfer" to have occurred, and "lapse" restrictions, which are not considered in making that determination. A "non-lapse" restriction is a restriction "which by its terms will never lapse." *Id.* § 1.83–3(h). It is "a permanent limitation on the transferability of property ... (1) Which will require the transferee of the property to sell, or offer to sell, such property at a price determined under a formula, and (2) Which will continue to apply to and be enforced against the transferee or any subsequent holder (other than the transferor)." *Id.* A "lapse" restriction "means a restriction other than a nonlapse restriction as defined in paragraph (h) of this section, and includes (but is not limited to) a restriction

that carries a substantial risk of forfeiture." *Id.* § 1.83–3(i).

The parties agree that if the M.S.A. § Restrictions are "non-lapse" restrictions, *i.e.* permanent restrictions—and thus are taken into account in determining the management stockholders' ownership interests in the 1980s—then the M.S.A. § sufficiently restricted the management stockholders' ownership interest in the stock, the stock was not "transferred" to them in the 1980s, and RIC should prevail in this action. The parties also agree that if the M.S.A. § Restrictions are "lapse" restrictions, *i.e.* non-permanent restrictions—and thus are not taken into account in determining the management stockholders' ownership interests in the 1980s—then the M.S.A. § did not sufficiently restrict the management stockholders' ownership interest in the stock, the stock was "transferred" to them in the 1980s, and the United States should prevail in this action.

## II. DISCUSSION

The Magistrate Judge found, and the United States argues, that under the plain and unambiguous language of Paragraph 9, the M.S.A. § Restrictions would "lapse" in the event of a "liquidation, merger, acquisition or other reorganization by or affecting RIC." (MSA art. II ¶ 9.) RIC objects that Paragraph 9 is ambiguous, and that the uncontroverted parol evidence establishes that Paragraph 9 was not intended to create a situation in which the M.S.A. § Restrictions would lapse.

This entire case accordingly reduces to a single question: Do the M.S.A. § Restrictions "lapse" in the event of a "liquidation, merger, acquisition or other reorganization by or affecting RIC," pursuant to Paragraph 9 of Article II?[2]

---

**2.** The United States concedes that if the M.S.A. § Restrictions do not lapse under Paragraph 9, then the M.S.A. § Restrictions

otherwise qualify as "non-lapse" restrictions, and RIC should prevail.

## A. STANDARD OF REVIEW

The court reviews *de novo* those portions of the Magistrate Judge's report or specified proposed findings or recommendations to which objection was made. *See* 28 U.S.C.A. § 636(b)(1) (West 1993 & Supp.2000). Summary judgment may be granted only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

## B. INTERPRETATION OF MSA

The question of whether a writing is ambiguous is a question of law. *See Tuomala v. Regent Univ.*, 252 Va. 368, 477 S.E.2d 501, 505 (1996). "An ambiguity exists when language admits of being understood in more than one way ... or when language is of doubtful import." *Westmoreland–LG&E Partners v. Virginia Elec. & Power Co.*, 254 Va. 1, 486 S.E.2d 289, 294 (1997). "When the meaning of language in a contract is clear and unambiguous ... the contract needs no interpretation, and '[t]he intention of the parties must be determined from what they actually say and not from what it may be supposed they intended to say.'" *Sully Station II Cmty. Ass'n, Inc. v. Dye*, 259 Va. 282, 525 S.E.2d 555, 556 (2000) (quoting *Carter v. Carter*, 202 Va. 892, 121 S.E.2d 482, 485 (1961)). The court must bear in mind that "the meaning of a contract 'is to be gathered from all its associated parts assembled as the unitary expression of the agreement of the parties.'" *Id.* (quoting *Berry v. Klinger*, 225 Va. 201, 300 S.E.2d 792, 796 (1983)). The court has conducted a careful review of the M.S.A. § in accordance with these principles, and finds that Paragraph 9 is highly ambiguous.

■ First, reading literally the first sentence of Paragraph 9 leads to an absurd result. The first sentence renders

ineffective "[t]he provisions hereof relating to Termination of Employment and the effects thereof," in the event of a liquidation, merger, acquisition, or other reorganization. The provisions relating to Termination of Employment are found in Paragraph 3. Rather than define what it means to be "terminated from employment," Paragraph 3 defines what it means to be "considered to be an employee of RIC," *i.e.* "not terminated": A management stockholder is considered to be not terminated if he "remain[s] in the active employ of RIC, or of any corporation controlled by RIC.... [or] any successor of RIC." (MSA art. II ¶ 3 at 5.) By rendering these provisions ineffective, the first sentence of Paragraph 9, when read literally, states that in the event of a liquidation, merger, acquisition, or other reorganization, a management stockholder is *not* "considered to be an employee of RIC" if he remains in the active employ of RIC or its successor. This first part of the first sentence is of doubtful import, because it would be absurd to read "remaining in the employ" of RIC as meaning "not being an employee" of RIC.

Second, another possible reading of the first part of the first sentence is that an employee is considered "terminated" upon liquidation, merger or other reorganization. This reading is of doubtful import when considered in conjunction with the second sentence of Paragraph 9—which states that in the event of a liquidation, merger, acquisition, or other reorganization, the management stockholder has all the rights of the other stockholders—because the other stockholders presumably have the right, in some circumstances, not to be terminated upon liquidation, merger, acquisition, or other reorganization.

Third, another possible but less literal reading of the first part of the first sentence of Paragraph 9 is that, by rendering

ineffective the provisions relating to "Termination of Employment" upon liquidation, merger, or other reorganization, Paragraph 9 makes such an event "not a termination of employment." Given this and the other possible meanings of sentence one, sentence one is ambiguous because it "admits of being understood in more than one way."

Fourth, the second part of sentence one renders ineffective the provisions relating to the "effects" of termination of employment. The "effects" of termination of employment are that the management stockholder is required to sell to RIC under the pricing formula of Article II. The provisions that restricted the management stockholders *prior* to termination, such as the restriction prohibiting transfer prior to termination, and the restriction prescribing who the shares could be sold to, do not relate to the *ex post* "effects" of termination, and would not appear to be rendered ineffective by the second part of the first sentence. Rather, the second part of the first sentence would only render ineffective the restriction that required the management stockholder to sell to RIC under the pricing formula of Article II. Therefore, the second part of the first sentence appears to render ineffective the requirement that the shares be sold for a certain price upon termination of employment, while leaving intact the prohibitions against transferring the shares prior to termination of employment. In other words, in the event of a liquidation, merger, acquisition, or other reorganization, a management stockholder would not have to sell if he was terminated, but nevertheless he could not sell his shares until that time.

If the first part of the first sentence means that a liquidation, merger, or other reorganization does not constitute a "termination of employment," the whole of the first sentence would mean that upon a liquidation, merger, or other reorganization, the management stockholder would not be terminated from employment, and would not be required to sell back his stock under the Article II pricing formula, but still could not sell his stock to anyone except RIC, and even then, could not do so until terminated. While reasonable, this reading is restrictive because it does not render ineffective *all* the M.S.A. § Restrictions.

This restrictive reading of the first sentence makes the language of the second sentence of doubtful import when the two are read together. Since sentence two cannot be read independently from sentence one, it is clear that sentence two in some way attempts to modify sentence one. Sentence one appears to prescribe the scope of Paragraph 9. Given the restrictive meaning of the first sentence, it is doubtful that sentence two modifies sentence one to the degree to which it appears to modify it when read in isolation, *i.e.* to the degree of rendering ineffective *all* of the M.S.A. § Restrictions in the event of a liquidation, merger, acquisition, or other reorganization. Accordingly, when sentence two is read in the context of sentence one, the extent to which sentence two modifies sentence one is ambiguous.

Fifth, the apparently clear language of sentence two is of doubtful import when read in conjunction with the other provisions of the MSA, which appear to contemplate that at least some of the M.S.A. § Restrictions would survive mergers and reorganizations: Paragraph 1 of Article II states that "this Agreement shall apply to any and all stock acquired by the Management Stockholder by reason of ... any other stock received by Management Stockholder with respect to his RIC stock," (MSA at 4–5), and Paragraph 3 states that a management stockholder

would not be considered "terminated" as long as he "remain[s] in the active employ of RIC, or of any corporation controlled by RIC ... [or] any successor of RIC." (MSA at 5.) The United States conceded at the hearing on this matter that in the event of a stock-for-stock merger, the M.S.A. § Restrictions would not lapse. In other words, the United States reads Paragraph 9 as subjecting the M.S.A. § Restrictions to lapse in the event of any type of reorganization, merger, or liquidation, *except* a stock-for stock merger. Such a reading creates an ambiguity, because, when read in isolation, the second sentence of Paragraph 9 appears to render the M.S.A. § Restrictions ineffective in the event of *any* type of liquidation, merger, acquisition, or reorganization. Nothing in the language of Paragraph 9 justifies distinguishing between stock-for-stock mergers and any other type of merger. The internal inconsistency of the United States's position buttresses the court's resolve that Paragraph 9 is ambiguous.

Accordingly, the court holds that Paragraph 9 is ambiguous, because the first sentence admits of being understood in more than one way, and because the isolated language of the second sentence is of doubtful import when read in conjunction with the first sentence and the other M.S.A. § provisions.

## C. PAROL EVIDENCE

"When the language of a contract is ambiguous, parol evidence is admissible, not to contradict or vary contract terms, but to establish the real contract between the parties." *Tuomala v. Regent Univ.*, 252 Va. 368, 477 S.E.2d 501, 505 (1996). Because Paragraph 9 is ambiguous, parol evidence is admissible to explain what the contracting parties intended it to mean. For this reason, the court shall deny the United States's motion to strike.

The court typically would submit an ambiguous contract to the trier of fact, "who must examine the extrinsic evidence to determine the intention of the parties." *Id.* In the instant case, the only parol evidence in the record was produced by RIC. Accordingly, RIC contends it is entitled to summary judgment.

■ "In a tax refund action ... the IRS's assessment of taxes is presumed correct, and the taxpayer bears the burden of proving otherwise." *Winstead v. United States,* 109 F.3d 989, 993 (4th Cir.1997). When the movant bears the burden of persuasion at trial, as is the case when a plaintiff moves for summary judgment on its own claim, the movant not only must satisfy the initial burden of production on the summary judgment motion by identifying the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), but also the ultimate burden of persuasion on the claim itself by "support[ing] its motion with credible evidence—using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331 (Brennan, J., dissenting).

■ The parol evidence produced by RIC includes affidavits and deposition testimony of several contracting parties. The parol evidence makes clear that Paragraph 9 was intended to lift the timing restriction on *when* the management stockholders could sell their stock. According to the parol evidence, Paragraph 9 was intended to provide that the management stockholders were not restricted to selling only upon "termination of employment," but also could sell upon liquidation, merger, acquisition, or other reorganization. (*See* Pl.'s Statement of Material Undisputed Facts Ex. A at 51 (stating that Paragraph 9 "was put in to try and explain that ... they

would not have to quit ... to get their 60 percent").) However, the contracting parties apparently did not intend Paragraph 9 to lift the restriction on *who* they could sell their stock to, *i.e.* they still could sell back their stock only to RIC or to a family member (who in turn could sell only to RIC). (*See, e.g.*, Pl.'s Statement of Material Undisputed Facts Ex. A at 55–56 ("[I]n effect the market was the company. It was not an outside market.").) Nor did the contracting parties intend to lift the restriction on the maximum and minimum buy-back prices of the stock, *i.e.* they still could only sell the stock for 60% of its book value, but would always be able to receive the original amount they paid for the stock. (*See* Pl.'s Statement of Material Undisputed Facts Ex. A at 51 (stating that "the other part of the reasoning was [that] ... if the company sold for something other than cash ... they would get their 60 percent in the same form as the other stockholders got it"; *id.* at 55 (affirming that "there were no circumstances under which a management stockholder would realize 100 percent of his stock"); Ex. B ("[T]he parties intended that in the event of a 'liquidation, merger, acquisition, or other reorganization ...' the Management Stockholders would never receive less than [the price they originally paid] ... nor more than 60 percent of the Book Value per share for their stock."); Ex. C (same).)

In other words, the parol evidence indicates that the contracting parties wanted to be sure the management stockholders could sell back their stock upon liquidation, merger, acquisition, or other reorganization, and receive the same *form* of consideration as the other stockholders. At the same time, the contracting parties intended that in the event of a liquidation, merger, acquisition, or other reorganization, the management stockholders would remain bound by the other restrictions in the MSA, such as the restriction on the *amount* of consideration the management stockholders could receive upon sale-back.

The question now becomes whether this evidence, if not controverted at trial, would entitle RIC to a directed verdict. It is clear from the parol evidence that the restriction on the timing of the sale-back to "termination of employment" is a lapse restriction, because the stock could be transferred not only upon termination of employment, but upon liquidation, merger, acquisition, or other reorganization. Therefore, the court shall not consider the sale-back timing restriction in determining whether a "transfer" of the property occurred in the 1980s. *See* 26 C.F.R. § 1.83–3(i) (2000). However, it is equally clear from the parol evidence that the management stockholders were permanently restricted from selling their shares to anyone but RIC or its successor for any more than 60% of the shares' book value. This indicates that no transfer occurred, because the "the consideration to be paid the [management stockholder] upon surrendering the property [would] not approach the fair market value of the property at the time of surrender." *Id.* § 1.83–3(a)(5). It is also clear that the management stockholders were permanently guaranteed a minimum sale-back price of no less than the price they paid for it. This too indicates that no transfer occurred, because the management stockholders "[did] not incur the risk of a beneficial owner that the value of the property at the time of transfer [would] decline substantially." *Id.* § 1.83–3(a)(6). Given these permanent restrictions on the management stockholders' ownership interest in the stock, the court finds the parol evidence sufficient to establish that the stocks were not actually "transferred" to the management stockholders in the 1980s. *See, e.g., id.* § 1.83–3(a)(7) (Example 5) (stating that no transfer would be deemed to have oc-

curred if the stock was subject to the sole restriction that the employee must sell back the stock for no less than he paid for it). If not controverted at trial, this evidence would entitle RIC to a directed verdict.

As the nonmoving party, the United States may not simply rest on its pleadings or on conclusory allegations but must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The United States produced no contrary evidence, and thus failed to create a genuine issue for trial in this case. The United States having failed to satisfy its burden, RIC's motion for summary judgment shall be granted, and judgment shall be entered in favor of RIC.

### III. CONCLUSION

The court concludes that Paragraph 9 is ambiguous, and that parol evidence is admissible to explain its intended meaning. The only parol evidence in the record demonstrates that several of the M.S.A. § Restrictions are "non-lapse" restrictions that permanently restricted the management stockholders' ownership interest to such a degree that their acquisition of the stock in the 1980s did not qualify as a "transfer" of the stock. Accordingly, the payments RIC made to the management stockholders in the 1990s were not to "redeem" the stock. Because RIC should have been allowed to deduct those payments, RIC's objections shall be sustained, and summary judgment shall be entered in favor of RIC.[3]

An appropriate Order this day shall issue.

### ORDER

By order dated January 5, 2000, the above-captioned case was referred to the presiding United States Magistrate Judge, for findings of fact and a recommended disposition. The parties filed cross-motions for summary judgment, and the United States filed a motion to strike. On October 26, 2000, the Magistrate Judge issued his Report and Recommendation. He recommended denying the plaintiff's motion for summary judgment, granting the United States's motion for summary judgment, and granting the United States's motion to strike. Both parties filed timely objections. Upon consideration of the objections and the responses thereto, the applicable law, and the documented record, having heard oral argument on the objections, and for the reasons stated in the accompanying Memorandum Opinion, it is accordingly this day

### ADJUDGED, ORDERED, AND DECREED

as follows:

1. The United States's objections, filed November 6, 2000, shall be, and they hereby are, DENIED AS MOOT;

2. The plaintiff's objections, filed November 9, 2000, shall be, and they hereby are, SUSTAINED;

3. The Magistrate Judge's Report and Recommendation, filed October 26, 2000, shall be, and it hereby is, REJECTED;

4. The United States's Motion for Summary Judgment, filed July 10, 2000, shall be, and it hereby is, DENIED;

5. The United States's Motion to Strike, filed July 24, 2000, shall be, and it hereby is, DENIED;

6. The plaintiff's Motion for Summary Judgment, filed July 10, 2000, shall be, and it hereby is, GRANTED;

---

3. The court does not consider RIC's alternative arguments, concerning the weight to be given IRS Private Letter Rulings, and the equitable nature, if any, of tax refund actions.

7. Judgment shall be, and it hereby is, entered in favor of the PLAINTIFF.

8. The parties shall file a joint stipulation on what damages and/or interest are appropriate, or a report of their failure to agree, within thirty (30) days from the entry of this Order.

The Clerk of the Court hereby is directed to send a certified copy of this Order and the accompanying Memorandum Opinion to Magistrate Judge Crigler and to all counsel of record.